**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

In re:                                                  Chapter 11 Cases

MILES PROPERTIES, INC.,                          Case No. 10-60797-PWB
a Georgia limited liability company, <u>et al.</u>,[1]

                                                         Joint  Administration Pending

        Debtors.

_____/

**<u>DECLARATION IN SUPPORT OF FIRST DAY PLEADINGS</u>**

## I.      <u>INTRODUCTION</u>

1.      My name is Ronald L. Glass. I am the Chief Restructuring Officer of the above-

captioned debtors (collectively, the "Debtors").

2.      On March 2, 2009, the Debtors (and certain non-Debtor affiliates) retained

GlassRatner Advisory & Capital Group, LLC ("GlassRatner") to provide interim management

services, including providing my services as Chief Restructuring Officer (the "CRO").  In my

_____

[1] The address of each of the Debtors is 3280 Peachtree Road, NW, Suite 600, Atlanta, GA 30305; and the last four digits of the taxpayer identification number of each of the Debtors follows in parenthesis:  (i) Miles Properties, Inc. (0768); (ii) MPI Development Group, Inc. (4100); (iii) MPI Portfolio I, LLC (8973); (iv) MPI Azalea, LLC (8322); (v) Miles-Cherry Hill, LLC (7619); (vi) Miles-Oak Park, LLC (4738); (vii) Miles-Fox Hollow, LLC (5940); (viii) Miles-April Ridge, LLC (0623); (ix) MPI Cimarron, LLC (5355); (x) MPI Sunset Place, LLC (5440); (xi) MPI Palms West, LLC (4133); (xii) MPI British Woods, LLC (9940); and (xiii) MPI Chaucer, LLC (5624).

2547428-4

capacity as CRO, I have reviewed the financial and operating performance of each of the Debtors (and their non-Debtor affiliates), including their profitability. On the date hereof, the Debtors are filing an application to retain GlassRatner to provide interim management services, and approving my appointment as CRO of the Debtors, in essence seeking authority for the continuation of my services as CRO on a post-petition basis.

3.      By way of background related to my qualifications to serve as CRO of the Debtors, I began my career in turnaround and crisis management in 1974 as Vice President of Great American Mortgage Investors ("Great American"), the third largest real estate investment trust in the United States.  I formulated and implemented an asset exchange program that allowed Great American to reduce its debt by more than $200 million and substantially reduce the number of its secured creditors. I continued with Great American assisting the company through a Chapter 11 filing and a successful reorganization. In 1978, I accepted an assignment from NCNB Mortgage (Bank of America) to evaluate and liquidate a major land holding in Augusta, Georgia. In 1981, I returned to Great American as the Chief Operating Officer ("COO") at the request of Sam Zell, who had recently acquired control of the company. During my initial eighteen months as COO, the company's general and administrative expenses were reduced by more than 50%, the company was stabilized and the stock price increased almost three-fold from $6.50 to $18.50 per share. I continued with Great American as it became a diversified holding company involved in manufacturing, agri-chemicals, financial services and real estate. The company was ultimately taken private at $55.00 per share.

2

4.    From 1981 until 1997, I held positions as COO and/or Executive Vice President of numerous entities controlled by Sam Zell, one of the most successful turnaround and dealmakers in the United States. As part of the executive group, I was privy to the structuring of several high profile investments, including the formation of the Zell/Merrill Opportunity Funds, which raised more than $1.5 billion of equity for the acquisition of commercial office buildings and apartments valued at over $6 billion, and the formation of Zell/Chilmark Partners, which raised more than $1 billion for investments in troubled companies. Some of the more notable transactions and turnarounds included well-known companies such as Revco Drugs, Schwinn Bicycle Company, Jacor Communications, The Broadway Stores and Midway Airlines.

5.    During my employment with the Zell Organization, some of the more prominent transactions in which I participated included the:

- Valuation & Liquidation of a multi-location hotel operating portfolio with assets in excess of $100 million.

- Valuation & Liquidation of $175 million multi-family portfolio, a $225 million shopping center portfolio, and a $220 million office portfolio.

6.    Ian Ratner and I formed GlassRatner in October, 2001. GlassRatner is a financial advisory firm which provides four primary service lines: (i) bankruptcy and restructuring advisory services, (ii) forensic and litigation accounting services, (iii) real estate advisory services, and (iv) mergers and acquisition consulting services. I have been personally involved in the liquidation and sale of well over $1 Billion of commercial real estate on a national basis.

7.    Since 1998, I have worked with several foreign real estate investors assisting in the acquisition of properties and on a variety of turnaround and bankruptcy matters including

3

Trustee and Receivership appointments. For example, in April 1999 I was appointed Chapter 11 Trustee in two real estate bankruptcies, where I successfully operated and then liquidated both companies. In addition, in April 2007, I was appointed Chief Restructuring Officer for a condominium conversion company, with in excess of $300 million in debt. That company controlled approximately 27 properties located throughout Florida and North Carolina.

8.      I attended University of Tennessee at Knoxville from 1964-1965 before transferring to Georgia State University in Atlanta, Georgia in 1965 where I received a B.A. in Business Administration with a major in Real Estate in 1969.

9.      I make the following statements in support of the petitions, various first day applications and motions filed in the Debtors' Chapter 11 bankruptcy cases.  I am over the age of eighteen, competent to testify to the matters herein set forth and if called upon to do so, I could and would testify to the facts set forth herein.

10.      The facts set forth herein are derived from my personal knowledge of the Debtors' businesses and operations in my capacity as CRO, along with my review of the Debtors' books and records, including those relating to the Debtors' financial and operating performance discussed herein.  I have also directed the preparation of cash flow projections for each of the Debtors that are described in more detail below, and have been involved in negotiations with certain primary lenders of the Debtors and other key constituents.

## II.      FACTUAL BACKGROUND

11.      On January 8, 2010 (the "Petition Date"), Miles Properties, Inc. ("MPI"), MPI Development Group, Inc. ("MPI Development"), MPI Portfolio I, LLC ("MPI Portfolio"), MPI

4

2547428-4

Azalea, LLC ("MPI Azalea"), Miles-Cherry Hill, LLC ("Miles-Cherry Hill"), Miles-Oak Park,

LLC ("Miles-Oak Park"), Miles-Fox Hollow, LLC ("Miles-Fox Hollow"), Miles-April Ridge,

LLC ("Miles-April Ridge"), MPI Cimarron, LLC ("MPI Cimarron"); MPI Sunset Place, LLC

("MPI Sunset"), MPI Palms West, LLC ("MPI Palms West"), MPI British Woods, LLC ("MPI

British Woods") and MPI Chaucer, LLC ("MPI Chaucer", each a "Debtor," collectively, the

"Debtors") filed voluntary petitions for relief under Chapter 11, title 11, United States Code, as

may be amended (the "Bankruptcy Code") in the United States Bankruptcy Court for the

Northern District of Georgia, Atlanta Division.  In my capacity as CRO, after having consulting

with the Company and advisors, including counsel, I caused the Debtors to file these Chapter 11

cases to facilitate a financial restructuring.

### A.    Background and Corporate Structure of the Debtors

12.    Prior to the Petition Date, MPI, a property management company owned by

Daniel J. Miles ("Mr. Miles" or "Daniel Miles"), MPI Development, and certain of the other

captioned Debtors and several related non-debtor affiliates (collectively, "Miles" or the

"Company"), were primarily engaged in the acquisition, development and management of "B"

and "C" class multifamily properties (collectively, the "Properties"), primarily in high growth

markets within the Southeastern portion of the United States.  As a result of my prior efforts to

turn back many of the Properties to their respective mortgage lenders and otherwise downsize the

Debtors' operations, the Properties managed by MPI are now heavily concentrated in the

Georgia and Florida areas, but also include holdings in Colorado, Maryland, North Carolina,

South Carolina, Tennessee, Texas and Virginia.

2547428-4

13.     Specifically, the Company had historically sought out underperforming properties that were over ten years old and undervalued at the time of acquisition due to either neglect, poor management and/or financial difficulties. Upon acquisition, the Properties were renovated and generally repositioned through increased effective rental rates, improved occupancy and implementation of certain more efficient management practices. In addition, the Company had also acquired a number of properties for the development of apartments and condominiums, either on a ground up or conversion basis.   The Properties were generally acquired via bridge financing through a number of lenders with whom the Company held a relationship with and then, upon stabilization, either sold, recapitalized or refinanced, with either a traditional loan or through collateralized debt obligations ("CDO").   In most cases, Mr. Miles is a personal guarantor of these loans.

14.     The membership interests in the property owner entities (the "Property Owner Entities")[2] are owned in part by Mr. Miles who owns anywhere from 52% to as much as 73% of the Property Owner Entities.   The other owners of the Property Owner Entities are either employees of MPI, former employees or contractors of MPI, MPI's affiliates or third parties. The managers (the "Managers") of the Property Owner Entities are owned by a common sole member—MPI Entity Manager, Inc., a Georgia corporation—of which Mr. Miles is the sole

---

[2] MPI Chaucer (Regal Crossing Apartments located in Dallas, Texas), MPI Cimarron (Royal Oaks Apartments located in Tampa, Florida), MPI Sunset (Royal Ridge Apartments located in St. Petersburg, Florida), MPI Palms West (Royal Springs Apartments located in Orlando, Florida), MPI British Woods (Hampton Forest Apartments located in Durham, North Carolina), MPI Azalea (Highland Brooke Apartments located in Atlanta, Georgia), Miles-Cherry Hill (Highland North Apartments located in Atlanta, Georgia), Miles-Oak Park (Highland Estates located in Decatur, Georgia), Miles-Fox Hollow (Highland Enclave located in Clarkston, Georgia), and Miles-April Ridge (Highland Gardens Apartments located in Chamblee, Georgia).

shareholder, director and officer.  Mr. Miles is also the entity manager of most of the various Managers of the Property Owner Entities and as such, prior to my appointment as CRO, Mr. Miles controlled the day-to-day management of the Properties owned by the Property Owner Entities.  Therefore, Mr. Miles individually (i) owns a majority interest in the Property Owner Entities, and (ii) prior to my appointment as CRO, controlled the Property Owner Entities as the owner and/or manager of the Managers of the Property Owner Entities.  **Composite Exhibit "A"** attached hereto consists of organizational charts for each of the Property Owner Entities.

15.    MPI Development is a corporation. MPI Development, like MPI,[3] is not a property owner.  MPI Development previously operated as a manager of development entities, but is no longer operating.

16.    Each of MPI and MPI Development is a corporation formed under the laws of the State of Georgia, with Mr. Miles owning 100% of the stock of each corporation. Each of MPI Portfolio, MPI Chaucer, MPI Cimarron, MPI Sunset, MPI Palms West, MPI British Woods, MPI Azalea, Miles-Cherry Hill, Miles-Oak Park, Miles-Fox Hollow, and Miles-April Ridge is a Georgia limited liability company with ultimate ownership ranging from one member, Mr. Miles, to several dozen members. MPI Portfolio is a single member limited liability company whose sole member is MPI Portfolio Holdings, LLC, a Georgia limited liability company.

17.    As a result of my engagement as CRO, from and after March 2, 2009, as such role was modified and supplemented at the request of creditors and interest holders other than Daniel

---

[3] MPI serves as the property manager for MPI Chaucer, MPI Cimarron, MPI Sunset Place, MPI Palms West, MPI British Woods, MPI Azalea, Miles-Cherry Hill, Miles Oak-Park, Miles-Fox Hollow, and Miles-April Ridge.

2547428-4

Miles, effective August 21, 2009, I received an irrevocable grant of a special power of attorney and an interest with full power of substitution to exercise all rights, powers, and privileges (including all applicable voting, consent and approval rights) of Daniel Miles in his capacity as shareholder, member, manager, managing member, CEO and/or officer with respect to each of the Debtors (and all Miles-related non-debtor affiliates) in order to cause them to take any action required by me pursuant to my engagement as CRO, or in connection with their respective operating agreements or by-laws, as applicable.

18.     MPI has approximately 228 employees. None of the other Debtors has any employees; their day-to-day operations are conducted by and through MPI as property manager. The Debtors (and their non-Debtor affiliates) maintain stand-alone financial statements and bank accounts, however, prior to February 2009, the Debtors shared a common cash management system.   Specifically, MPI and most affiliates, including the Debtors, utilized a so-called "Zero Balance Account System" (the "ZBA") as their primary cash management system since 1999, or inception of the respective entity, whichever came later.   The ZBA was comprised of a top-level master account and sub-accounts for MPI and the aforementioned affiliates, including the Debtors.   Each day, funds deposited into the sub-accounts were up-streamed into the master account.   When checks or other debits were presented for a particular entity sub-account, the necessary funds were down-streamed from the master account into the respective sub-account, regardless of whether or not the specific sub-account was owed money from the master account, and then processed like any other debit.   Remaining funds in the master account in excess of the down-streamed amounts were not returned to their respective sub-accounts.   Beginning in

8

2547428-4

November 2008, at the advice and direction of counsel, no additional funds were down-streamed from the master account into sub-accounts which constituted affiliate advances. The use of the ZBA was subsequently discontinued in February 2009 and all existing ZBA sub-accounts were either closed, converted into a stand-alone account at the existing depository bank, or closed and opened as a stand-alone account at a new depository bank.

19.     As a result of the manner in which the Debtors previously operated their cash management system, there are significant intercompany claims owed by and among the Debtors (and their non-Debtor affiliates) as cash generated by one Debtor or non-Debtor affiliate was used to pay expenses of another Debtor or non-Debtor affiliate on a regular basis.

20.     Based on my review of the books and records of the Debtors (and their non-Debtor affiliates), the exact amount of intercompany claims cannot be readily or precisely quantified.  Moreover, I believe that it would require the expenditure of such an inordinate amount of professional fees in order to recreate thousands of transactions between the Debtors (and their non-Debtor affiliates), spanning up to ten years, that it is not practically or economically feasible to do so.  Further, even if the forensic recreation of such intercompany claims were practical and economically feasible, it is highly doubtful that the results achieved would be reliable as there is substantial doubt as to the accuracy of the books and records of the Debtors (and their non-Debtor affiliates) over the past ten years.  Moreover, it is impossible to recover in respect of intercompany claims from affiliated LLC entities whose underlying Properties have since been foreclosed and otherwise have no assets.

2547428-4

21.     Based on the foregoing, management of the Company, under my direction, has taken a balance sheet approach to establishing the estimated intercompany claims.  Specifically, each Debtor (and non-Debtor affiliate) established its reconciled general ledger account balance upon closing of the ZBA in February 2009.  Next, based on the actual master account bank balance and the general ledger balances of the master account and each sub-account upon ZBA closing, each Debtor (and non-Debtor affiliate) calculated their pro-rata portion of actual cash in the bank.  The difference between this calculated pro-rata cash balance and the reconciled general ledger balance of each Debtor (and non-Debtor affiliate) was used to establish the amount of the intercompany claim.

**B.    The Debtors' Multi-Family Projects**

22.     As of the Petition Date, other than MPI, MPI Development and MPI Portfolio, the other Debtors owned and operated multi-family projects in Georgia, Florida, North Carolina and Texas.  Each apartment complex is identified and described by State below.

*i.    Georgia Projects*

a.     Miles-April Ridge owns the Highland Gardens Apartments located in Chamblee, Georgia. Highland Gardens is a 100 unit apartment complex that was built in 1966.  The property had 88% occupancy as of 1/8/10.

b.     MPI Azalea owns the Highland Brooke Apartments located in Atlanta, Georgia. Highland Brooke is a 407 unit apartment complex that was built in 1971.  The property had 47% occupancy as of 1/8/10.

c.     Miles-Cherry Hill owns the Highland North Apartments located in Atlanta, Georgia. Highland North is a 244 unit apartment complex that was built in 1967.  The property had 83% occupancy as of 1/8/10.

d.     Miles-Oak Park owns Highland Estates Apartments located in Decatur, Georgia. Highland Estates is a 151 unit apartment complex that was built in 1974.  The property had 86% occupancy as of 1/8/10.

10

      e.      Miles-Fox Hollow owns Highland Enclave Apartments located in Clarkston, Georgia. Highland Enclave is a 208 unit apartment complex that was built in 1983. The property had 85% occupancy as of 1/8/10.

### ii    *Florida Projects*

      a.      MPI Cimarron owns the Royal Oaks Apartments located in Tampa, Florida. Royal Oaks is a 400 unit apartment complex that was built in 1971. The property had 90% occupancy as of 1/8/10.

      b.      MPI Sunset owns the Royal Ridge Apartments located in St. Petersburg, Florida. Royal Ridge is a 138 unit apartment complex that was built in 1970. The property had 90% occupancy as of 1/8/10.

      c.      MPI Palms West owns the Royal Springs Apartments located in Orlando, Florida. Royal Springs is a 151 unit apartment complex that was built in 1970. The property had 87% occupancy as of 1/8/10.

### iii.    *North Carolina Project*

      a.      MPI British Woods owns the Hampton Forest Apartments located in Durham, North Carolina. Hampton Forest is a 400 unit apartment complex that was built in 1972. The property had 86% occupancy as of 1/8/10.

### iv.    *Texas Project*

      a.      MPI Chaucer owns the Regal Crossing Apartments located in Dallas, Texas. Regal Crossing is a 384 unit apartment complex that was built in 1985. The property had 78% occupancy as of 1/8/10.

**C.**    **Industry/Business Conditions**

23.    The Company's operations are concentrated in the real estate industry. The economy, generally, and the real estate industry, specifically, have suffered a dramatic slowdown after years of strong growth, driven, in part, by low consumer confidence and tightening credit availability.[4]    The Company has accumulated past due payables that are creating operational

---

[4] Some of the information contained in this section of this Declaration is derived from my review of publicly available information.

2547428-4

issues as vendor refusal to continue to provide goods and services precludes or slows down unit turnover. Moreover, bad debt losses are significantly above historical levels as the available tenant base has a lower economic/credit profile than historically normal for multi-family properties of the type owned and operated by the Company. This is driven by several factors, including rising unemployment and the large "shadow market" of available single-family homes and condominiums for rent that is applying downward pricing pressure to apartment rents. Further, turnover rates are also well above normal levels, primarily due to the circumstances noted above. These higher turnover rates have negatively impacted both repair and maintenance expenses and utility costs, which, in conjunction with a lack of adequate capital, have negatively affected the Company's ability to turn and lease units and, consequently, have led to a decline in occupancy rates.

24.     The Company had also invested in a number of land positions acquired for purposes of multi-family or commercial mixed-use development. Unfortunately, none of these projects progressed to the vertical development stage primarily due to the tightening capital markets.

25.     The secured and unsecured debts for each of the Debtors have faced various challenges, including maturity defaults, monthly principal and interest payment defaults and failure to meet certain debt coverage service ratio ("DCSR") requirements. The specific details for each Debtor are discussed further below in "Liquidity and Capital Structure."

26.     As a result of the foregoing issues, the properties in which the Company is involved have generally experienced a significant decrease in operating cash flow. In many

2547428-4

cases, net operating income has decreased below that required to service the debts of the Properties. This has necessitated the Company to complete a property-by-property analysis of current cash flows, identify options to improve operating income and review financing alternatives. As a result of this analysis, the Company identified projects that needed to be, are in the process of or have been divested or where agreements might be reached with existing lenders for a restructuring of debt allowing the property to return to performing status.

27. More generally, in respect to the economy, the commercial real estate capital markets have recently experienced considerable liquidity and other business challenges stemming from, among other things, high default rates on the loans, declining asset values as well as a steep decline in loan originations, impairing the ability to originate loans that could be sold on profitable terms and substantially reducing lender cash flows and net income. According to the FDIC, one hundred forty banks have failed between January 2009 and November 2009,[5] including Corus Bank, N.A. (Chicago, Illinois), Colonial Bank (Montgomery, Alabama) and BankUnited, FSB (Coral Gables, Florida), as well as two Atlanta area banks—Silverton Bank, N.A. and Integrity Bank—that through either the FDIC or subsequent note buyers are creditors of certain non-Debtor affiliates.[6] The turmoil in the U.S. economy has resulted in the acquisition of Bear Stearns by JP Morgan Chase, a bankruptcy filing for Lehman Brothers Holdings Inc., an

---

[5] *See* http://www.fdic.gov/bank/historical/bank.html.

[6] Silverton Bank, N.A. made loans to each of MPI Eagle Cliff, LLC, MPI Northbrook, LLC, MPI Ivy Commons, LLC and MPI Covington Walk, LLC. Integrity Bank made a loan to MPI Meridian, LLC. Each of MPI Eagle Cliff, LLC, MPI Northbrook, LLC and MPI Covington Walk, LLC are identified in "Further Restructuring Efforts" below as entities that may eventually file their own Chapter 11 cases.

2547428-4

$85 billion bailout of AIG and a massive economic rescue plan exceeding $700 billion recently approved by Congress.  While as of late the stock market, and other macro economic indicators generally, have started to improve, the fundamental problems associated with the real estate market and the lack of liquidity remain as substantial obstacles.

D.   **Events Leading to Chapter 11 Filing**

28.     As described above, the Debtors' financial condition has deteriorated, in large part, due to the substantial economic downturn, including tightening capital markets, rising unemployment and declining rents, among other items.   Further, certain Debtors have been severely impacted by the intercompany claims through the ZBA.

29.     In September 2007, Miles Properties, Inc. hired James L. Mauck Jr. to serve as Chief Financial Officer ("CFO") of Miles Properties, Inc.  In Mr. Mauck's role as CFO, he was brought in to assume responsibility for overseeing the Debtors' (and certain non-Debtor affiliates) accounting, financial planning & analysis, cash management and purchasing functions. I understand that Mr. Mauck's prior experience includes leadership roles with two publicly held companies and the accounting firm KPMG, LLP.  I further understand that Mr. Mauck  is a Certified Public Accountant ("CPA") and holds a Bachelor of Science in Accounting with a double major in Finance from Virginia Tech from which he graduated in 1996.

30.     Shortly after joining the Company, the CFO discovered, among other things, that most balance sheet accounts for most of the Debtors (and non-Debtor affiliates) had not been fully reconciled in quite some time, including the ZBA cash accounts.   The CFO began implementing processes for improving balance sheet controls, starting with cash, including basic

14

2547428-4

bank reconciliations.  In January 2008, he engaged Tatum, LLC, a professional Accounting and Finance firm, to assist with completing bank reconciliations and other cash-related internal control improvements, among other items.  Tatum was engaged for approximately three months, during which time two additional CPAs were hired into the Company and significant accounting and internal control improvements were made; however, all cash sub-accounts within the ZBA were not fully reconciled to the top-level master account until August of 2008.  Shortly thereafter, in light of the economic downturn noted above, coupled with the potential intercompany claims resulting from the use of the ZBA, MPI began interviewing legal and financial advisory firms specializing in corporate restructuring.

31.     In October 2008, Mr. Miles retained  my firm and the law firm of  Berger Singerman, P.A. to help address the Company's financial issues and assist in restructuring or reorganizing MPI, MPI Development, the Property Owner Entities and certain non-Debtor affiliates.  From October of 2008 through July of 2009, as the economy continued to deteriorate, the Company's professionals attempted to address these financial issues and restructure the loans on as many Properties as possible.  The Company's professionals met with various lenders and other stakeholders with limited success.   In fact, in May of 2009, four of the non-Debtor affiliates formerly managed by MPI filed Chapter 11 petitions to restructure the debt on four performing properties in Norcross, Georgia as a result of a foreclosure and receivership  action filed by Regions Bank.

32.     In July 2009, the Company, Mr. Miles and their respective professionals met with an unofficial ad hoc committee comprised of investors in certain Property Owner Entities and

15

non-Debtor affiliates and the unsecured noteholders of MPI and MPI Development  (the "Ad Hoc Committee") to present a global restructuring proposal.    This proposal generally contemplated Mr. Miles utilizing a significant portion of his net assets, exclusive of personal real property and holdbacks for projected personal income tax liability, to restructure MPI, MPI Development, the Property Owner Entities and certain non-Debtor affiliates. The proposal was rejected and, at the insistence of the Ad Hoc Committee, Mr. Miles ultimately stepped down from his role as Chief Executive Officer of MPI in August and my role of CRO was expanded, as mentioned above.

33.    Despite the best efforts of myself and the other professionals, occupancy levels and revenues at MPI and many of the Property Owner Entities have continued to decline as a result of the economic and market conditions discussed above, coupled with tightening cash balances.  Property maintenance, advertising and the ability to turn units to lease to new residents have suffered.  In addition, employee turnover has increased due, in part, to the lack of capital and growing frustration over the inability to appropriately manage the Properties.  In an attempt to address these cash shortfalls, I sent notices for additional capital contributions to the members of certain of the Property Owner Entities and non-Debtor affiliates.  I received very little response from these notices and did not receive any additional capital.  Many of the Properties now have little or no equity and have already been turned back to the  mortgage lenders.  Additional properties of the non-Debtor affiliates may be surrendered in this manner in the future.

16

2547428-4

34.    While I continued my restructuring efforts, in October 2009, Mr. Miles communicated a revised proposal to the Ad Hoc Committee which provided that a new investor-created entity would take over his ownership and membership interest in certain properties, including many of the Debtors.  The new entity was to own, manage and control most of the remaining properties. Mr. Miles was to have no role whatsoever in the new entity but would remain as a guarantor of the underlying mortgage loans  (subject to certain indemnification rights).  In exchange, he proposed to retain his existing ownership and membership interest in a small number of the Properties as to which I had previously made a general determination lacked equity or an ability to turnaround without a significant infusion of capital and lender concessions. The Ad Hoc Committee responded that (i) they would be prepared to agree to Mr. Miles retaining an ownership interest in certain properties subject to other specific considerations to be determined; (ii) they would require an upfront cash payment from Mr. Miles in an amount to be negotiated; and (iii) the new entity could be formed if (a) a new asset sponsor was put in place, (b) the respective lenders on the properties consented, and (c) Mr. Miles agreed to contribute a significant portion of his existing liquidity and future earnings (in an amount to be agreed upon); among other items.  The Ad Hoc Committee also responded that no further delay was acceptable because the Properties were languishing, and that no further proposals would be entertained by the Ad Hoc Committee absent Mr.  Miles' agreement to fund the Chapter 11 filing for MPI.

35.    Generally speaking, the situation at MPI and many of the Property Owner Entities and non-Debtor affiliates continued to deteriorate and several Properties had reached critical points where it was clear that the only possible way to protect the Properties worth saving from

17

2547428-4

receivership and/or foreclosure was through a Chapter 11 filing.  At that time, I sent out further capital call notices and requests to investors to consent to Chapter 11 filings for many of the properties.   The capital call notices were ignored and in some instances the consents to filing withdrawn over self-interest by members seeking to exclude various non-debtor entities from the filing

(a)    Specifically, with respect to the Wachovia Portfolio Borrowers, these cases were necessitated due to the servicer having asserting a technical default based upon an artificially high debt service coverage ratio resulting in the establishment of a Curtailment Reserve.  As discussed in greater detail below, the curtailment has had a significant negative impact on the capital necessary to operate and maintain the Properties which are otherwise capable of meeting debt service;

(b).    Specifically with respect to Debtor, Miles-April Ridge, LLC the filing of Chapter 11 was necessitated, in my view, to preserve value and avoid foreclosure, even though the investors failed to meet capital call requests during the course of my prepetition restructuring efforts;

(c)    Specifically with respect to Debtor, MPI Chaucer, LLC the Chapter 11 filing, in my view, was necessary to support the turnaround efforts and potential value in the property for all creditors and investors.

36.    The Debtors commenced these cases in order to gain breathing room which will allow them to pursue a financial restructuring that is intended to maximize the value of their assets for all constituents.  The Debtors have engaged in discussions with certain lenders and

18

noteholders, where applicable, regarding loan restructuring or extension options and will continue to do so. In addition, significant steps have already been taken to reduce operating expenses, including office space reductions, adjustments to staffing levels, the reduction in discretionary expenses, property tax appeals and various other reductions in operating expenses at the Property Owner Entities. The Debtors will continue to pursue cost reductions, where applicable, during the course of the reorganization.

**E.**     **Liquidity and Capital Structure**

The Debtors are owned in part by Mr. Miles who directly or indirectly owns from 52% to as much as 100% of each entity. The liquidity and capital structure for each Debtor is further discussed below.

**(i)**     **Miles Properties, Inc.**

With the exception of two financing agreements for property insurance and workers compensation totaling $1,233,737 (discussed further below), MPI has no secured debt. MPI has guaranteed a debt owed to Wachovia by Mr. Miles in respect of a line of credit utilized by MPI and the ZBA for the benefit of all of the Debtors and certain non-Debtor affiliates in the amount of $1,656,000 plus accrued interest, penalties and fees. Additionally, Wachovia has alleged that MPI guaranteed $10.8 Million loaned to MPI Transaction Management, LLC, in connection with the acquisition of an aircraft previously utilized by the Company.

MPI also has unsecured notes payable to various private investors in the approximate amount of $4,156,847 plus accrued interest (referenced to as the "Mezz Notes")..
There are approximately fifty-one Mezz Notes outstanding and the principal amounts generally

2547428-4

range from $5,500 to $400,000. Approximately $980,000 of the notes payable are personally guaranteed by Mr. Miles. With the exception of five Mezz Notes totaling $365,000, all Mezz Notes issued by MPI have matured.

MPI had a cash position of approximately $209,488 upon the commencement of the Chapter 11 case. Further, MPI expects to generate approximately $267,000 in cash flow, after payments to professionals, during the first twenty-six weeks in Chapter 11. This cash flow projection is subject to various assumptions regarding the continued management of certain multifamily properties, and may change significantly depending on the ultimate outcome of any changes in the property management or the timing of any such changes in property management of these multifamily properties that materially differ from the assumptions. Any cash flow shortfalls or cash flow timing shortfalls will be serviced by DIP Financing discussed further below. A complete list of all multifamily properties currently under MPI management is included as **Exhibit "B."**

MPI also has $665,000 due to MPI Woodland View, LLC and $827,784 due to Miles Development Group, Inc.

  (ii)  **MPI Development Group, Inc.**

MPI Development also has Mezz Notes payable to various private investors in the approximate amount of $4,518,503 plus accrued interest. There are approximately sixty-seven Mezz Notes outstanding and the principal amounts generally range from $10,000 to $500,000. Approximately $964,653 of the Mezz Notes payable are personally guaranteed by Mr. Miles.

2547428-4

With the exception of three Mezz Notes totaling $115,000, all Mezz Notes issued by MPI Development have matured.

MPI Development had a cash position of approximately $1,896 upon the commencement of the Chapter 11 cases. As MPI Development no longer has active projects under its management that are generating fee revenue, MPI Development does not anticipate having any operating cash flow during the first thirteen weeks of Chapter 11.

### (iii)    MPI Portfolio I, LLC

MPI Portfolio I, LLC is indebted to Wachovia Bank in the approximate amount of $11,860,930.00 (the "MPI Portfolio Debt").[7] The MPI Portfolio Debt is a second lien on the Properties serving as the collateral for the MPI Cimarron Debt, the MPI Sunset Debt, the MPI Palms West Debt, the MPI British Woods Debt, the MPI Azalea Debt, the Miles-Cherry Hill Debt, the Miles-Oak Park Debt and the Miles-Fox Hollow Debt. The MPI Portfolio Debt is evidenced by that Loan and Security Agreement (Mezzanine Loan) entered into on May 17, 2007, in favor of Wachovia and the following: a) Promissory Note, dated May 17, 2007, in the amount of $15,000,000.00 in favor of Wachovia, b) Collateral Assignment of Interest Rate Hedge Agreement dated May __, 2007, in favor of Wachovia, and c) Mezzanine Lockbox Agreement, dated May 17, 2007, in favor of Wachovia, (collectively the "MPI Portfolio Loan Documents").

---

[7] The MPI Portfolio Debt owed to Wachovia is guaranteed by Mr. Miles. The MPI Portfolio Debt is nonrecourse to MPI Portfolio  pursuant to section 4.1 of the Promissory Note entered into on May 17, 2007 which provides, in part, as follows: "Notwithstanding anything to the contrary contained in this Note or the other Loan Documents, the obligations of Borrower hereunder shall be non-recourse except with respect to the Property and as otherwise provided in Section 8.01 of the Security Instrument…."

2547428-4

Under the MPI Portfolio Loan Documents, MPI Portfolio was required to pay, on a monthly basis, beginning on July 9, 2007, and through and including June 9, 2010, all accrued but unpaid interest on the outstanding principal amount of the loan at the Interest Rate as provided in the MPI Portfolio Loan Documents.   The unpaid principal balance of the Note, together with all accrued and unpaid interest, is due and payable in full on June 9, 2010.

### (iv)    Miles-April Ridge, LLC (Highland Gardens)

Miles-April Ridge, LLC is indebted to Principal Commercial Funding, LLC ("Principal Commercial Funding") in the approximate amount of $3,195,050.00 plus any accrued interest, penalties and fees (the "Miles-April Ridge Debt").[8]  The Miles-April Ridge Debt is evidenced by that Loan Agreement entered into on August 5, 2002 in favor of  Principal Commercial Funding, and the following: (a)  Secured Promissory Note entered into on August 5, 2002 in the principal amount of $3,500,000.00, in favor of Principal Commercial Funding, (b) Assignment of Leases and Rents, dated August 5, 2002, in favor of Principal Commercial Funding, (c) Environment Indemnity Agreement entered into on August 5, 2002, in favor of Principal Commercial Funding, and (d) Escrow Security Agreement entered into on August 5, 2002, in favor of Principal Commercial Funding  (collectively, the "Miles-April Ridge Loan Documents"). Under

---

[8] The Miles-April Ridge Debt owed to Principal Commercial Funding, LLC is guaranteed by Mr. Miles. The Miles-April Ridge Debt is nonrecourse to Miles-April Ridge pursuant to ¶9 of the Secured Promissory Note entered into on August 5, 2002 which provides, in part, as follows: "Notwithstanding any provision to the contrary in this Note or the Loan Documents and except as otherwise provided for below, the liability of Borrower and any general partner of Borrower under the Loan Documents shall be limited to the interest of Borrower and any general partner of Borrower in the Premises and the Rents. In the event of foreclosure of the liens evidenced by the Loan Documents, no judgment for any deficiency upon the Indebtedness evidenced by the Loan Documents shall be sought or obtained by Lender against Borrower or any general partner of Borrower."

2547428-4

the Miles-April Ridge Loan Documents, commencing on October 1, 2002, Miles-April Ridge was required to pay principal and interest in monthly installments of $22,053.37 per month, until fully paid.   Miles-April Ridge was also required to pay replacement reserve, property tax and insurance escrows on a monthly basis.    All remaining principal, interest to and including the date of payment, and other Indebtedness, are due and payable on September 1, 2012.  Miles-April Ridge is approximately four months behind on principal, interest and escrow payments as required under the Loan Documents.  Miles-April Ridge last made payments of principal, interest and escrow in August, 2009 and November, 2009 in the aggregate amounts of $34,551.91 each.

Miles-April Ridge had a cash position of approximately $45,650 upon the commencement of the Chapter 11 case.   Further, Miles-April Ridge expects to have approximately $118,282 in cash shortfalls, after interest and escrow payments required under the Loan Documents, projected utility deposits, professional and administrative fees, during the first thirteen weeks of Chapter 11.  These cash shortfalls will be supplemented by the existing cash on hand noted above and, if need be, DIP Financing which is discussed further below.

Miles-April Ridge also has a $20,000 unsecured Note Payable plus accrued interest owing to Mr. Miles that matures on December 31, 2010.

23

2547428-4

(v)    **MPI Azalea, LLC (Highland Brooke); Miles-Cherry Hill, LLC (Highland North); Miles-Oak Park, LLC (Highland Estates); Miles-Fox Hollow, LLC (Highland Enclave); MPI Cimarron, LLC (Royal Oaks); MPI Sunset Place, LLC (Royal Ridge); MPI Palms West, LLC (Royal Springs) and MPI British Woods, LLC (Hampton Forest)**

MPI Azalea, Miles-Cherry Hill, Miles-Oak Park, Miles-Fox Hollow, MPI Cimarron, MPI Sunset, MPI Palms West and MPI British Woods (collectively, the "Wachovia Portfolio" or the "Wachovia Portfolio Borrowers"), are jointly and severally liable for and indebted to Wachovia Bank in the approximate amount of $73,300,543.00 (the "Wachovia Portfolio Debt").[9] The Wachovia Portfolio Debt is evidenced by the following:  (a) Promissory Note, dated May 17, 2007, as amended, in favor of Wachovia Bank, in the principal amount of $92,700,000.00, (b) Deed to Secure Debt, Security Agreement, Assignment of Rents and Fixture Filing, dated May 17, 2007, in favor of Wachovia Bank, (c) Assignment of Leases and Rents and Security Deposits, dated May 17, 2007, in favor of Wachovia Bank, and (d) Rent Account Agreement, dated May 17, 2007, in favor of Wachovia Bank (collectively, the "Wachovia Portfolio Loan Documents").  The outstanding principal amount on the Note reflects indebtedness of the entities comprising the Wachovia Portfolio Borrowers. The underlying assets held by the entities comprising the Wachovia Portfolio Borrowers are cross-collateralized and cross-defaulted.

---

[9] The Wachovia Portfolio Debt is guaranteed by Mr. Miles. The Wachovia Portfolio Debt is nonrecourse to the entities comprising the Wachovia Portfolio Debtors pursuant to section 4.1 of the Promissory Note entered into on May 17, 2007, as amended, which provides, in part, as follows: "Notwithstanding anything to the contrary contained in this Note of the other Loan Documents, the obligations of Borrower hereunder shall be non-recourse except with respect to the Property and as otherwise provided in Section 18.32 of the Security Instrument…."  There were two non-Debtor obligors on the Promissory Note, MPI Fountain Square, LLC and MPI Timbers, LLC; however, the properties owned by these two entities were sold to unrelated third parties in the first quarter of 2008 and the Wachovia Portfolio Loan Documents (as defined below) were modified to reflect, among other things, the sale of these properties.

2547428-4

Under the Wachovia Portfolio Loan Documents, each of the Wachovia Portfolio Borrowers was required to pay interest, on a monthly basis, at the Interest Rate as provided in the Wachovia Portfolio Loan Documents. The Wachovia Portfolio Borrowers were also required to pay replacement reserve, property tax and insurance escrows on a monthly basis.   The principal balance of the Note, together with all accrued and unpaid interest and any other amounts due and payable thereon, is due and payable in full on June 9, 2010 or, if such date is not a Business Day, the immediately preceding Business Day.  The maturity on the Note is eligible for a one-year extension through June 9, 2011 if certain conditions are met, including a DCSR of 1.20 to 1.00 on the consolidated Wachovia Portfolio and a Loan-To-Value Ratio of .75 on the consolidated Wachovia Portfolio.

On October 9, 2009, the entities comprising the Wachovia Portfolio received notice from the Servicer that because the DCSR for the Wachovia Portfolio had fallen below 1.05:1.00, the Note entered into an O&M Operative Period in which all cash flow in excess of required interest payments, escrows and budgeted operating expenses were to be held in a Curtailment Reserve at Wachovia Bank.  This curtailment had a significant impact on the availability of working capital needed to operate and maintain the Properties.   As a result of the lack of necessary working capital, the Wachovia Portfolio Borrowers' monthly revenue, on a combined basis, has declined significantly from approximately $1,100,000 in September 2009 to approximately $1,006,000 in December 2009  These cases were commenced, in part, to undue the Servicer having invoked a Curtailment Reserve and covenant default that is premised on an artificially high DSCR.

25

2547428-4

Since the inception of the Loan, the entities comprising the Wachovia Portfolio have made all prepetition loan and escrow payments required of them, including payments for November, 2009 and December, 2009 in the aggregate amounts of $274,316.50 and $270,043.65, respectively, and will continue to do so. The entities comprising the Wachovia Portfolio had a cash position, inclusive of cash held in Lender-controlled accounts in excess of the January 2010 required interest and escrow payments, as follows: (i) MPI Azalea— approximately  $83,000; (ii) Miles-Cherry Hill—approximately $146,000; (iii) Miles-Oak Park—approximately $78,000; (iv) Miles-Fox Hollow—approximately $103,000; (v) MPI Cimarron—approximately $266,000; (vi) MPI Sunset—approximately $80,000; (vii) MPI Palms West—approximately $85,000; and (viii) MPI British Woods—approximately $199,000, respectively, upon the commencement of their Chapter 11 cases.  The entities comprising the Wachovia Portfolio expect to incur, on a consolidated basis, approximately $597,000 in cash flow shortfalls, including debt service, escrow payments, projected utility deposits, professional and administrative fees, during the first thirteen weeks in Chapter 11.  Save for the negative cash flows attributed to Debtors, MPI Azalea and Miles-Oak Park, the Wachovia Portfolio Borrowers would generally be able to sustain their operations and remain cash flow positive.  These cash shortfalls will be supplemented by the existing cash on hand noted above and, if need be, DIP Financing which is discussed further below.

### (vi)    MPI Chaucer, LLC (Regal Crossing)

MPI Chaucer is indebted to Regal Crossing Apartments, LP in the approximate amount of $10,116,533.00 plus any accrued interest, penalties and fees (the "MPI Chaucer Debt").[10] The MPI Chaucer Debt is evidenced by that Construction Loan Agreement dated November ___, 2006, as amended, and the following:  (a)  Promissory Note dated November 27, 2006, as amended, in favor of Regions Bank, in the principal amount of $10,316,450.00, (b) Deed of Trust With Absolute Assignment of Leases and Rents, Security Agreement and Fixture Filing dated November 27, 2006, as amended, in favor of Regions Bank, and (c) Assignment of Borrower's Interest in Contracts, Documents and Rights dated November ___, 2006, as amended, in favor of Regions Bank (collectively, the "MPI Chaucer Loan Documents").   On December 18, 2009, Regions Bank sold and conveyed the Promissory Note to Regal Crossing Apartments, LP.

Under the MPI Chaucer Loan Documents, MPI Chaucer was required to pay, on a monthly basis, accrued and unpaid interest at the Interest Rate as provided in the MPI Chaucer Loan Documents, commencing on January 5, 2007 and continuing through November 1, 2009. Additionally, MPI Chaucer was required to pay monthly installments of principal commencing on July 1, 2008 and continuing through November 1, 2009.  The unpaid principal balance of the Note, together with all accrued and unpaid interest and any other amounts due and payable thereon, was due and payable in full on December 1, 2009.

---

[10] The MPI Chaucer Debt owed to Regal Crossing Apartments, LP is guaranteed by Mr.  Miles.

2547428-4

MPI Chaucer has made all prepetition payments required of it through maturity including principal and interest payments for October, 2009 and November, 2009 in the aggregate amount of $31,697.61 and $32,226.95 and will continue to do so.  MPI Chaucer had a cash position of approximately $296,000 upon the commencement of these Chapter 11 cases.  Further, MPI Chaucer expects to incur approximately $45,000 in cash flow shortfalls, after debt service, projected utility deposits, professional and administrative fees during the first thirteen weeks in Chapter 11.

**F.**     **Further Restructuring Efforts**

In my view, the Miles-related, non-debtor entities for which  I continue to act as CRO may be able to be restructured without the necessity of future relief under Chapter 11.  In the event that I do not obtain the requisite lender and investor support to achieve out-of-court restructurings it is more than likely that additional entities will need to be included in these jointly administered cases including, without limitation, the following entities:

> Miles-Ansley Oaks, LLC
> MPI Eagle Cliff, LLC
> MPI Northbrook, LLC
> MPI Covington Walk, LLC
> MPI Cedar Pointe, LLC
> MDP Block A, LLC
> MDP Block B, LLC
> MDP Block C, LLC
> MDP Block D, LLC
> MDP Block E, LLC
> MDP Block F, LLC

2547428-4

G.      **Prepetition Lawsuits**

37.      As of the Petition Date, the Debtors, by themselves and among others, were named defendants in multiple lawsuits in state courts in Alabama, Colorado, Florida, Georgia, Delaware, Maryland, North Carolina, South Carolina, Tennessee, Texas and Virginia, consisting primarily of personal injury, workers compensation, wrongful eviction and vendor claims. These lawsuits were at varying stages as of the Petition Date. The Debtors will file Suggestions of Bankruptcy in each of these lawsuits to advise the courts and other parties of the filing of these Chapter 11 cases, and the imposition of the automatic stay provisions of section 362(a) of the Bankruptcy Code.

III.      **NECESSITY FOR EMERGENCY HEARINGS ON "FIRST DAY" MOTIONS**

38.      Contemporaneously herewith, the Debtors have filed or are filing the following motions and applications (collectively, the "First Day Motions"):

   a.      Debtors' Application for Authority to Retain GlassRatner Advisory & Capital Group LLC, *Nunc Pro Tunc* to Petition Date;

   b.      Debtors' Application for Approval of Employment of Berger Singerman, P.A. as Counsel to the Debtors in Possession *Nunc Pro Tunc* to Petition Date;

   c.      Debtors' Application for Approval of Employment of Foltz Martin, LLC as Counsel to the Debtors in Possession *Nunc Pro Tunc* to Petition Date;

   d.      Debtors' Motion to Limit Notice;

   e.      Debtors' Motion to Establish Procedures for Monthly and Interim Compensation and Reimbursement of Expenses for Professionals;

   f.      Debtors' Emergency Omnibus Motion to Reject Executory Contracts and Unexpired Leases as of the Petition Date;

2547428-4

g.　　Miles Properties, Inc.'s Emergency Motion for Order (1) Authorizing It to (A) Pay Prepetition Employee Wages, Salaries, Commissions, Benefits and Other Compensation; (B) Remit Withholding Obligations; (C) Maintain Employee Benefits Programs and Pay Related Administrative Obligations and (2) Authorizing Applicable Banks and Other Financial Institutions to Honor, Process and Pay Checks Presented for Payment and to Honor Certain Fund Transfer Requests;

h.　　Debtors' Motion for Authorization to Pay Prepetition Property, Sales, Use, Franchise, Trust Fund and Other Taxes and Similar Obligations;

i.　　Debtors' Motion for Authorization to (I) Continue to Administer Commercial General Liability Insurance and Other Insurance Policies, and (II) Continue to Pay Claims to the Extent They Become Due and Payable;

j.　　Debtors, MPI Cimarron, LLC, MPI Azalea, LLC, Miles-Cherry Hill, LLC, Miles-Oak Park, LLC, Miles-Fox Hollow, LLC, MPI British Woods, LLC, MPI Palms West, LLC, MPI Sunset Place, LLC and MPI Portfolio, LLC's Emergency Motion for Authority to (1) Continue Use of Existing Business Forms and Records; and (2) Maintain Existing Corporate Bank Accounts and Cash Management Systems;

k.　　Debtors, Miles Properties, Inc., MPI Development Group, Inc., Miles-April Ridge, LLC, and MPI Chaucer, LLC's Emergency Motion for Authority to (1) Continue Use of Existing Business Forms and Records; and (2) Maintain Existing Corporate Bank Accounts and Cash Management Systems;

l.　　Debtors, MPI Portfolio I, LLC, MPI Cimarron, LLC, Miles-Fox Hollow, LLC, Miles-Oak Park, LLC, Miles-Cherry Hill, LLC, MPI Azalea, LLC, MPI British Woods, LLC, MPI Palms West, LLC and MPI Sunset Place, LLC's Emergency Motion for Authority to Use Cash Collateral;

m.　　Debtor, Miles-April Ridge, LLC's Emergency Motion for Authority to Use Cash Collateral; and

n.　　Debtor, MPI Chaucer, LLC's Emergency Motion for Authority to Use Cash Collateral.

39.　　As more fully described in Section IV, below, I believe it is necessary for the relief sought in the First Day Motions to be granted on an expedited basis. In addition, the

2547428-4

Debtors are filing a Motion for Interim and Final Orders Under Sections 105(a), 361, 363, 364 and 507 of the Bankruptcy Code, and Federal Rules of Bankruptcy Procedure 2002, 4001 and 9014, (I) Authorizing Debtors to Incur Post-Petition Secured Indebtedness on Super-Priority Basis and Modifying the Automatic Stay, and (II) Prescribing the Form and Manner of Notice and Setting Final Hearing Thereon, which they seek to have heard in conjunction with Daniel J. Miles' Motion for Authority to Provide DIP Financing to the MPI Entities which is to be filed in his individual Chapter 11  case pending before this Court, *In re: Daniel J. Miles*, Case No. 09-92601.

## IV.      FIRST DAY MOTIONS[11]

**A.      Applications to Retain Professionals**

   *i.      Retention of GlassRatner Capital & Advisory Services LLC*

40.      The Debtors seek approval of the employment of the financial consulting firm of GlassRatner Capital & Advisory Services, LLC as interim management, including providing my services as CRO for the Debtors, effective as of the Petition Date.

41.      The Debtors have selected GlassRatner because of the firm's extensive experience with providing restructuring advice to companies inside and outside of bankruptcy. GlassRatner has extensive experience and knowledge in the field of crisis management and restructuring of companies in reorganization cases under Chapter 11 of the Bankruptcy Code. GlassRatner has expended significant resources working with the Debtors and their counsel in connection with their ongoing efforts to restructure their financial affairs, including preparation for the filing of

---

[11]  All capitalized terms not defined below shall have the same meanings ascribed to them in the applicable applications and motions.

2547428-4

these Chapter 11 cases. GlassRatner has become extremely familiar with the Debtors' business operations and financial obligations to various creditors' constituencies.

42.    GlassRatner was not owed any fees and costs as of the Petition Date and is not otherwise a creditor of the Debtors.

### ii.    *Retention of Berger Singerman, P.A.*

43.    The Debtors seek approval of the employment of the law firm of Berger Singerman, P.A. ("Berger Singerman") as attorneys for the Debtors, effective as of the Petition Date.

44.    The Debtors have selected Berger Singerman as their bankruptcy attorneys because of the firm's extensive experience with business reorganizations. Berger Singerman has extensive experience and knowledge in the field of debtors' and creditors' rights and representing business debtors in reorganization cases under Chapter 11 of the Bankruptcy Code. Berger Singerman has expended significant resources working with the Debtors to prepare for the filing of these cases. Berger Singerman was retained in November, 2008 and since then has been intimately involved in restructuring efforts, including having worked with GlassRatner which was retained by the Debtors and with whom Berger Singerman has worked extensively. As a result of these sustained efforts, Berger Singerman has become extremely familiar with the Debtors' business operations and legal obligations to various creditors' constituencies. Berger Singerman's appearance before this Court for the matters in these Chapter 11 cases will be efficient and cost effective for the Debtors' estates.

2547428-4

45.    Berger Singerman was not owed any fees and costs as of the Petition Date and is not otherwise a creditor of the Debtors.

46.    To the best of the Debtors' knowledge, except as disclosed in the *Declaration of Brian K. Gart, on Behalf of Berger Singerman, P.A., as Proposed Counsel to Debtors-in-Possession, Nunc Pro Tunc to the Petition Date*, Berger Singerman has no connection with the Debtors' creditors or other parties in interest or their respective attorneys.

47.    Counsel has informed me that corporations must be represented by a licensed attorney in federal court.  Because of the wide range of relief sought by the Debtors on an expedited basis, I believe the Debtors would suffer immediate and irreparable harm if they were not able to obtain the immediate services of counsel from the outset of these Chapter 11 cases. For example, the Debtors need representation for the hearing(s) on the First Day Motions, including concerning the immediate use of cash collateral and approval of post-petition financing.  Without the availability or financing and use of cash, the Debtors will not be able to operate their businesses and reorganize their financial affairs for the benefit of their estates. Therefore, I believe that immediate approval of Berger Singerman's retention is critical in order to avoid immediate and irreparable injury.

### iii.    Retention of Foltz Martin, LLC

48.    The Debtors seek approval of the employment of the law firm of Foltz Martin, LLC ("Foltz Martin") as  local attorneys for the Debtors, effective as of the Petition Date.

49.    The Debtors have selected Foltz Martin as their local bankruptcy attorneys because of the firm's experience with business reorganizations.  Foltz Martin has extensive

2547428-4

experience and knowledge in the field of debtors' and creditors' rights and representing business debtors in reorganization cases under Chapter 11 of the Bankruptcy Code. Foltz Martin has worked with the Debtors to prepare for the filing of these cases. Foltz Martin's appearance before this Court for the matters in these Chapter 11 cases will be efficient and cost effective for the Debtors' estates. Foltz Martin currently serves as local counsel working with Berger Singerman as Debtors' counsel in other Chapter 11 cases pending in this district. *In re: MPI Eagles, LLC et al.,* Case No. 09-73804 (JEM).

50.    Foltz Martin was not owed any fees and costs as of the Petition Date and is not otherwise a creditor of the Debtors.

51.    To the best of the Debtors' knowledge, except as disclosed in the *Declaration of Halsey Knapp on Behalf of Foltz Martin, LLC, as Proposed Counsel to Debtors-in-Possession, Nunc Pro Tunc to the Petition Date*, Foltz Martin has no connection with the Debtors' creditors or other parties in interest or their respective attorneys.

52.    Counsel has informed me that corporations must be represented by a licensed attorney in Georgia and federal court. Because of the wide range of relief sought by the Debtors on an expedited basis, I believe the Debtors would suffer immediate and irreparable harm if they were not able to obtain the immediate services of counsel from the outset of these cases. For example, the Debtors need representation for the hearing(s) on the First Day Motions, including concerning the immediate use of cash collateral and approval of post-petition financing. Without the availability or financing and use of cash, the Debtors will not be able to operate their business and reorganize their financial affairs for the benefit of their estates. Therefore, I believe that

34

2547428-4

immediate approval of Foltz Martin's retention is critical in order to avoid immediate and irreparable injury.

**B.**     **Request To Limit Notice**

53.     The Debtors request that the Court limit notice of all matters, other than "Material Matters," to the following parties:

a.     The U.S. Trustee;

b.     The Debtors;

c.     The Debtors' bankruptcy attorneys;

d.     The members of and attorneys to any official committee established pursuant to 11 U.S.C. § 1102, and, before such appointment, the creditors shown on the Debtors' Consolidated List of Forty Largest Unsecured Creditors;

e.     Creditors holding claims known to be secured by property in which the estates have an interest;

f.     The United States and its agencies as required by Bankruptcy Rule 2002(j);

g.     Those parties and attorneys who have formally requested notice by filing with the Court and serving upon Debtors' attorney a notice of appearance or request for service of notices and papers in these Chapter 11 cases;

h.     Any examiner or trustee (and their attorneys) appointed in these Chapter 11 Cases; and

i.     Any party against whom direct relief is sought by motion, application or otherwise, including, without limitation, the non-debtor party to an executory contract being assumed or rejected, parties asserting interest in property being sold, and the like.

54.     The Debtors propose that notice of Material Matters will be sent to all creditors, which I understand is consistent with the Bankruptcy Rules.

2547428-4

55.     The Debtors' creditor matrix consists of hundreds of persons and entities which may claim an interest in these cases, which would make mailings to all creditors and parties-in-interest costly and burdensome to the Debtors' estates.  Certain of these Creditors are individuals who are current tenants whose security deposits are being held by one or more of the Debtors and former tenants who are or may be entitled to the return of security deposits which determination will not be made until the end of the particular lease term (unless the tenant leaves prematurely). The Debtors anticipate that many creditors and other parties-in-interest will file requests for service in these cases.   The Debtors also expect that numerous motions and applications will be filed in these cases in pursuit of various forms of relief.

56.     The Debtors also believe that limiting notice will reduce the administrative burden upon the Debtors, the Court and its staff and is in the best interests of the Debtors, their estates, creditors and other parties in interest.

57.     I understand from proposed bankruptcy counsel that  relief similar to that requested herein has been granted in this district. *See, e.g., In re MPI Eagles, LLC, et al.,* Case No. 09-73804 (JEM) (Bankr. N.D. Ga. June 19, 2009).

C.     **Request To Approve Procedures For Interim Compensation For Professionals**

58.     The Debtors are requesting that the Court enter an order establishing a procedure for compensating and reimbursing professionals on a monthly basis.

59.     The Debtors have filed an application to retain Berger Singerman,[12] and anticipate

seeking to retain a financial advisor/investment banker.  Further, I have been advised that in the

event an official committee is appointed, that such committee could engage professionals whose

approved fees are to be paid from the estate.

60.     The Debtors believe that monthly billing will assist the Court and parties-in-

interest to effectively monitor the fees incurred, and the Debtors will be able to spread out

payments of professional fees, rather than suffer larger depletions to their cash flows on an

irregular basis.

61.     I understand from proposed bankruptcy counsel that this Court has previously

granted relief like that sought herein. *See, e.g., In re Atlantis Plastics, Inc., et al,* Case No. 08-

75473 (PWB) (Bankr. N.D. Ga. Sept. 3, 2008).

**D.     Motion to Reject Executory Contracts and Unexpired Leases**

62.     The Debtors seek approval of the rejection of the executory contracts and

unexpired leases of non-residential real property identified in **Exhibit "A"** to the Debtors'

motion (collectively, the "Contracts").

63.     The Debtors have determined, in the exercise of their business judgment, that the

Contracts are either unnecessary to the administration of their estates or burdensome because the

---

[12] The Debtors have also filed an application seeking approval of the employment of GlassRatner to
provide interim management to the Debtors, however, GlassRatner will be paid, if approved, pursuant to
the terms of its engagement letter with the Debtors.

2547428-4

Debtors are either unable to perform, or the cost to perform is greater than the benefit to their estates.

64.     As I understand it, the immediate rejection will preclude the accrual and assertion of administrative expense claims against the Debtors' estates and thus benefit the estates and their creditors.

65.     I believe the Debtors would suffer immediate and irreparable harm if they were not able to immediately reject the Contracts.  This is because as has been explained to me, administrative expense claims could accrue from and after the filing of the Debtors' Chapter 11 Cases. Therefore, I believe that it is critical that the Court consider the motion on an expedited basis in order to avoid the potential incursion of administrative expenses that I believe would cause injury to the Debtors' estates. Proposed bankruptcy counsel has advised that the relief sought is authorized by Section 365(a) of the Bankruptcy Code.

**E.     Request to (i) Pay Prepetition Wages and Related Items, (ii) Maintain Employee Benefit Programs, and (iii) Authorizing Banks to Honor and Process Checks**

66.     The Debtors request authority to (i) pay or honor employee-related obligations including, but not limited to, prepetition wages, salaries, commissions, employee benefits and other compensation; (ii) remit withholding obligations; (iii) maintain employee benefits programs and pay related administrative obligations; (iv) continue to reimburse MPI for employee-related obligations funded on behalf of the Debtor Property Owner Entities; and (v) authorizing the Debtors' banks and other financial institutions to receive, process, honor and pay certain checks presented for payment and to honor certain fund transfer requests related to the foregoing.

67.     The Debtors' gross Prepetition Employee Obligations (as described in the motion), total approximately $342,376.27. The Debtors estimate that wage-related deductions, i.e., taxes and 401(k) deductions, for unpaid pre-petition wage related items total approximately $91,072.09 and request authority to pay those amounts to the appropriate taxing authorities and 401(k) administrator.  The Debtors' employees also accrue paid time off ("PTO"), however, the Debtors are requesting authority to allow employees to use their paid time off in the ordinary course of business; however, none of the Debtors pay accrued PTO to Employees.

68.     The Debtors also request the ability to continue benefits offered pre-petition to their employees, including medical, dental and disability insurance, as well as a 401(k) retirement plan, as well as the ability to pay or transfer any prepetition expenses or deductions related thereto.

69.     It is my understanding that as a result of the commencement of these Chapter 11 cases, and in the absence of an order of the Court providing otherwise, the Debtors will be prohibited from paying or otherwise satisfying their Prepetition Employee Obligations

70.     I believe that it is imperative for the Debtors to honor employee wage-related obligations and benefits in order to maintain Employee morale at this critical time for the Debtors, as well as to minimize the personal hardship the Employees would suffer if prepetition employee-related obligations are not paid when due.  I believe that if the relief is not granted, employees will immediately resign, which would impact the Debtors' ability to serve its approximately 16,000 residents and successfully reorganize their financial affairs, administer the estates and would otherwise result in irreparable injury to the Debtors' estates.

2547428-4

71.     I understand from proposed bankruptcy counsel that this Court has previously granted  relief like that sought herein. *See, e.g., In re Atlantis Plastics, Inc., et al,* Case No. 08-75473 (PWB) (Bankr. N.D. Ga. Aug. 12, 2008).

**G.     Request to Pay Prepetition Use, Franchise, Trust Fund, and Other Taxes**

72.     The Motion seeks entry of an order authorizing, but not directing, the Debtors to pay prepetition property, sales, use, franchise, trust fund, and other taxes and similar obligations, as detailed herein, in the ordinary course of their respective businesses.  In addition, the Debtors request that (i) to the extent they have paid certain taxes which should not have been paid, the Court authorize them to seek a refund of such taxes, and (ii) to the extent that they dispute any such pre-petition tax, the Court authorize them to set aside, in a segregated account, funds to pay the subject tax until a final determination is made as to whether they are obligated to pay the subject tax.

73.     In connection with the operation of their businesses, the Debtors (a) incur certain taxes and collect or incur payroll and employment-related taxes (collectively the "Taxes") on behalf of various taxing authorities; (b) are charged fees, licenses, and other similar charges and assessments by various licensing authorities, and collect certain fees from its customers (collectively the "Fees").  The Taxes and Fees are paid to various taxing and licensing authorities (the "Authorities") on a periodic basis (whether monthly, quarterly, or yearly) that is established for each particular Tax or Fee.

2547428-4

74.      As of the Petition Date, the Debtors estimate that they owe to the Authorities, on a pre-petition basis, approximately $387,576.83 in Taxes and Fees as reflected in the chart attached as **Exhibit "A"** to the Motion.

75.      The Debtors believe that the failure to pay the Taxes and Fees could have a material adverse impact on their ability to operate in the ordinary course and successfully reorganize.  Disputes relating to Taxes and Fees could impair the Debtors' ability to conduct business and successfully reorganize.

76.      The Debtors further request that all depositories on which checks were drawn in payment of pre-petition amounts to the Authorities be directed to clear such checks as and when presented for payment.

77.      The timely payment of Taxes and Fees is therefore necessary and in the best interest of the Debtors' estates.

78.      I understand from proposed bankruptcy counsel that this Court has previously granted  relief like that sought herein. *See, e.g., In re Atlantis Plastics, Inc., et al,* Case No. 08-75473 (PWB) (Bankr. N.D. Ga. Aug. 12, 2008).

**H.      Request to Administer Insurance Policies and Pay Claims To The Extent They Become Due and Payable**

79.      The Debtors seek authority, in their reasonable business judgment, to (i)  continue to administer General Liability Insurance, D&O Liability Insurance, Workers Compensation Insurance and E&O Insurance Liability Policies, (ii) continue to pay claims, deductibles and/or premiums to the extent they may become due and payable according to the terms of such policies and (iii)  continue to pay AICCO, Inc.'s ("AICCO") monthly fee for financing the General

2547428-4

Liability Insurance and Workers Compensation Insurance. The Debtors further request authority to pay all such amounts in the ordinary course of their businesses.

      (a)     **General (Property) Liability Insurance Policy**

      80.     MPI maintains a comprehensive insurance policy that provides property, general liability and umbrella coverage, among other items. The General Liability Insurance policy covers the other Debtors, as well as certain non-Debtor entities, is in effect as of the Petition Date and listed on **Exhibit "A"** to the Motion. The General Liability Insurance policy is financed through AICCO, with an initial down payment made at the beginning of the policy period and ten (10) periodic monthly installment payments made to AICCO during the policy period. All premiums due to the insurance carriers under the General Liability Insurance policy are paid through May 14, 2010 via the financing agreement with AICCO.

      (b)     **Officers and Director Insurance Policy**

      81.     MPI maintains an officer and director insurance liability policy, employee practices liability policy, fiduciary liability policy and crime policy. The D&O Liability Insurance policy covers the other Debtors, as well as certain non-Debtor entities, is in effect as of the Petition Date and listed on **Exhibit "A"** to the Motion. The premium for the D&O Liability Insurance policy is paid in advance. All premiums due under the D&O Liability Insurance policy are paid through March 20, 2010.

      (c)     **Workers Compensation Insurance Policy**

      82.     MPI maintains a workers compensation insurance policy. The Workers Compensation Liability Insurance policy covers the other Debtors, as well as certain non-Debtor

entities, is in effect as of the Petition Date and listed on **Exhibit "A"** to the Motion.  The Workers Compensation Insurance policy is financed through AICCO and periodic payments to AICCO are made in ten (10) monthly installments. All premiums due to the insurance carriers under the Workers Compensation Insurance are paid through September 27, 2010 via the financing agreement with AICCO.

   **(d)** **Professional Liability Policy**

  83. MPI maintains a professional liability policy.  The E&O Liability Insurance policy covers the other Debtors, as well as certain non-Debtor entities, is in effect as of the Petition Date and listed on **Exhibit "A"** to the Motion. The premium for the E&O Liability Insurance policy is paid in advance.  All premiums due under the E&O Liability Insurance are paid through March 27, 2010.

   **(e)** **Insurance Premium Financing**

  84. The Debtors use AICCO to finance the General Liability Insurance and Workers Compensation Insurance policies. MPI has entered into insurance premium financing agreements with AICCO with respect to the General Liability Insurance and Workers Compensation Insurance policies. Pursuant to these Agreements, MPI makes ten (10) monthly payments to AICCO in the total amount of $481,814.42 and $23,106.55, respectively, which amount includes principal and interest, with interest fixed at 4.93% and 4.85%, respectively.

2547428-4

**(f)      Insurance Payments to MPI From Certain Other Debtors**

85.     Certain of the Debtors which  are included in the General Liability Insurance policy[13] and the Workers Compensation Insurance policy[14] make payments to MPI for their respective portion of the financing agreements on a monthly basis. These payments are based on each Debtor's premium expenses and the amount of such expense that was financed on its behalf. MPI then uses these payments, in the aggregate, to make the required monthly financing payments to AICCO.

**(g)      Reservation of Rights**

86.     To the extent that the General Liability, Workers Compensation, Directors and Officers and Errors and Omissions Insurance policies may be deemed executory contracts, the Debtors do not at this time seek authority to assume the contracts as provided for in section 365(a) of the Bankruptcy Code.   The Debtors request only authorization to continue the programs, pay claims in accordance with the programs, and pay such premiums and administrative expenses as may be necessary to keep the policies in force.

87.     The Debtors believe that the relief requested is necessary and appropriate under the circumstances will allow them to comply with applicable U.S. Trustee Guidelines for maintaining insurance and ensure that appropriate insurance coverage is available to protect their

---

[13] Miles-April Ridge, LLC, MPI Cimarron, LLC, MPI Sunset Place, LLC, MPI Palms West, LLC, MPI British Woods, LLC, MPI Azalea, LLC, Miles-Cherry Hill, LLC, Miles-Oak Park, LLC, Miles-Fox Hollow, LLC and MPI Chaucer, LLC, LLC.

[14] Miles-April Ridge, LLC, MPI Cimarron, LLC, MPI Sunset Place, LLC, MPI Palms West, LLC, MPI British Woods, LLC, MPI Azalea, LLC, Miles-Cherry Hill, LLC, Miles-Oak Park, LLC, Miles-Fox Hollow, LLC and MPI Chaucer, LLC.

2547428-4

respective interests in property and employees who are necessary to effectuate a successful reorganization.  I understand from proposed bankruptcy counsel that this Court has previously granted  relief like that sought herein. *See, e.g., In re Atlantis Plastics, Inc., et al,* Case No. 08-75473 (PWB) (Bankr. N.D. Ga. Aug. 12, 2008).

**I**      **Request to Maintain Use of Cash Management and Existing Business Forms**

88.     I understand that the Office of the United States Trustee has established certain operating guidelines for debtors-in-possession in order to supervise the administration of Chapter 11 cases (the "Guidelines").  The Guidelines require Chapter 11 debtors to, among other things, close all existing bank accounts and open new debtor-in-possession ("DIP") bank accounts, establish one DIP account for all estate monies required for the payment of taxes (including payroll taxes), maintain a separate DIP account for cash collateral, and obtain checks for all DIP accounts that bear the designation, "debtor-in-possession," the bankruptcy case number, and the type of account.   The Debtors, through two separate motions,[15] seek a waiver of these requirements.

89.     The Debtors seek a waiver of the requirement that they open a new set of books and records as of the Petition Date because the Debtors respectfully submit that opening a new set of books and records would create unnecessary administrative burdens and would cause unnecessary expense, utilization of resources, and delay.  With the use of computer technology, it will be easy to differentiate between pre and post-petition transactions by date.  In the ordinary

---

[15] One of the motions will be filed by MPI Cimarron, MPI Azalea, Miles-Cherry Hill, Miles-Oak Park, Miles-Fox Hollow, MPI British Woods, MPI Palms West, MPI Sunset and MPI Portfolio, with the other motion being filed by MPI, MPI Development, Miles-April Ridge and MPI Chaucer.

45

course of business, the Debtors use many checks, invoices, stationery, and other business forms. By virtue of the nature and scope of the business in which the Debtors are engaged, and the numerous other parties with whom the Debtors deal, the Debtors need to be permitted to use their existing business forms without alteration or change. A substantial amount of time and expense would be required in order to print new checks and other business forms. Fulfillment of the requirement would likely delay payment of post-petition claims and negatively affect operations. Accordingly, the Debtors respectfully request that they be authorized to continue to use their existing business forms and to maintain their existing business records.

90.    The Debtors also request authority to maintain their existing bank accounts (each a "Bank Account" or "Account" and collectively, the "Bank Accounts" or "Accounts") and cash management systems (each a "Cash Management System" and collectively, the "Cash Management Systems") in accordance with their usual and customary practices to ensure a smooth transition into Chapter 11 with minimal disruption to operations. The Debtors also request authority to close any of the Bank Accounts if, in the exercise of their business judgment, the Debtors determine that such action is in the best interest of their estates.

91.    Only if the Bank Accounts are continued with the same account numbers can the transition into Chapter 11 be smooth and orderly, with minimal interference with continuing operations. In order to conduct their post-petition businesses, the Debtors need to be able to issue checks to vendors, service providers, employees, and others. To open new accounts and obtain checks for those accounts will cause delay and disruption to the Debtors' businesses. Moreover, as discussed above, a change in the Accounts to which customers wire and route

payments could delay the Debtors' receipt of funds needed for operations. By preserving business continuity and avoiding operational and administrative paralysis that would result from closing the existing Bank Accounts and opening new ones, all parties-in-interest, including employees, vendors, and customers, will be best served, and the benefit to the Debtors' estates will be considerable.  The confusion that might otherwise result would only work to the detriment of these chapter 11 cases.  The Debtors recognize that checks issued prior to the Petition Date will not be honored, except as otherwise provided by separate order of the Court.

92.    The Debtors employ a Cash Management System similar to those commonly employed by corporate enterprises of size and complexity comparable to the Debtors. A list of the Debtors' Bank Accounts is set forth on **Exhibit "A"** to each Motion.

93.    The Debtors will continue to maintain records respecting all transfers between and among the Bank Accounts so that all transactions can be ascertained after they have occurred.  In addition, the Debtors will instruct their banks to add the designation, "Debtor-in-Possession" or "DIP" to their current and any future domestic Accounts with each such bank, will treat the Accounts for all purposes as Accounts of the Debtors as DIPs, and will maintain records that recognize the distinction between pre-petition and post-petition transfers.

94.    The Debtors believe that their current cash is relatively safe because the Debtors' financial institutions—Wachovia Bank and SunTrust Bank—are, upon information and belief, financially stable and upon the list of depositories approved by the Office of the United States Trustee.

2547428-4

95. For the reasons stated above, I believe that the circumstances of these cases warrant the maintenance of the Debtors' Cash Management System.

96. I understand from proposed bankruptcy counsel that this Court has previously granted  relief like that sought herein. *See, e.g., In re Atlantis Plastics, Inc., et al,* Case No. 08-75473 (PWB) (Bankr. N.D. Ga. Aug. 12, 2008).

**J.** **Request for Authority to Use Cash Collateral filed by Debtors, MPI Portfolio I, LLC, MPI Cimarron, LLC, Miles-Fox Hollow, LLC, Miles-Oak Park, LLC, Miles-Cherry Hill, LLC, MPI Azalea, LLC, MPI British Woods, LLC, MPI Palms West, LLC and MPI Sunset Place, LLC**

97. Debtors MPI Portfolio I, LLC, Cimarron, LLC, Miles-Fox Hollow, LLC, Miles-Oak Park, LLC, Miles Cherry Hill, LLC, MPI Azalea, LLC, MPI British Woods, LLC, MPI Palms West, LLC and MPI Sunset Place, LLC are requesting authority to use the cash collateral of Wachovia Bank, N.A.   These Debtors owns real property consisting of the following apartment complexes: (a) MPI Cimarron owns the Royal Oaks Apartments located in Tampa, Florida; (b) Miles-Fox Hollow owns the Highland Enclave Apartments located in Clarkston, Georgia; (c) Miles-Oak Park owns the Highland Estates Apartments located in Decatur, Georgia; (d) Miles-Cherry Hill owns the Highland North Apartments located in Atlanta, Georgia; (e) MPI Azalea owns the Highland Brooke Apartments located in Atlanta, Georgia; (f) MPI British Woods owns the Hampton Forest Apartments located in Durham, North Carolina; (g) MPI Palms West owns the Royal Springs Apartments located in Orlando, Florida; and (h) MPI Sunset owns the Royal Ridge Apartments located in St. Petersburg, Florida (collectively, the "Apartment Complexes").

48

98.     Wachovia Bank, N.A. holds a security interest in each of the Apartment Complexes as well as the leases and rents, and all tangible and intangible property located at the Apartment Complexes.  Through this motion, the Debtors seek to retain the rents and other collections received to meet certain operating and capital expenses incurred in the ordinary course of business and necessary for the continued maintenance and operation of the Apartment Complexes.

99.     I believe that it is imperative that the Debtors be able to use the rents received in the ordinary course of business or the Debtors' operations and the ability to maintain their Properties will be greatly impaired, resulting in immediate and irreparable harm to the tenants residing at the Apartment Complexes.  I believe that the use of the rents is essential to avoid jeopardizing the health and welfare of the tenants.

**K.     Request for Authority to Use Cash Collateral filed by Debtor, Miles-April Ridge, LLC**

100.     Debtor Miles-April Ridge, LLC is seeking authority to use the cash collateral of Principal Commercial Funding, LLC. Principal Commercial Funding, LLC holds a security interest in real property owned by this Debtor, consisting of an apartment complex named Highland Gardens located in Chamblee, Georgia, as well as leases and rents, and all tangible and intangible property located at Highland Gardens.

101.     Through this motion, the Debtor seek to retain the rents and other collections received to meet certain operating and capital expenses incurred in the ordinary course of business and necessary for the continued maintenance and operation of the apartment complex.

2547428-4

102.    I believe that it is imperative that the Debtor be able to use the rents received in the ordinary course of business or the Debtor's operations and the ability to maintain its property will be greatly impaired, resulting in immediate and irreparable harm to the tenants residing at the apartment complex.  I believe that the use rent is essential to avoid jeopardizing the health and welfare of the tenants, as well as the Debtor's ability to reorganize.

**L.**      **Request for Authority to Use Cash Collateral filed by Debtor, MPI Chaucer, LLC**

103.    MPI Chaucer, LLC is seeking authority to use the cash collateral of Regal Crossing Apartments, LP, which holds a security interest in real property owned by the Debtor, consisting of an apartment complex named Regal Crossing Apartments located in Dallas, Texas, as well as the leases and rents, and all tangible and intangible property located at the apartment complex.

104.    Through this motion, the Debtor seek to retain the rents and other collections received to meet certain operating and capital expenses incurred in the ordinary course of business and necessary for the continued maintenance and operation of the apartment complex.

105.    I believe that it is imperative that the Debtor be able to use the rents received in the ordinary course of business or the Debtor's operations and the ability to maintain its property will be greatly impaired, resulting in immediate and irreparable harm to the tenants residing at Regal Crossing Apartments.  I believe that the use rent is essential to avoid jeopardizing the health and welfare of the tenants, as well as the Debtor's ability to reorganize.

2547428-4

M.      **DIP Financing Motion**

106.      In conjunction with Daniel Miles' Motion for Authority to Provide DIP Financing to the Debtors as pending in his personal case, (*In re: Daniel J. Miles*, Case No. 09-92601 (PWB)) and not on an emergency basis, the Debtors seek ultimate authority approval to obtain post-petition financing, up to the maximum amounts of $1.1 million pursuant to the terms and conditions as set forth in the DIP Loan Documents and the proposed Final Order from Mr. Miles. As of the Petition Date, certain of the Debtors do not have sufficient working capital or financing to operate their businesses on a go-forward basis; therefore, they will need post-petition financing and the ability to use cash collateral.  The success of these Chapter 11 cases and the stabilization of the Debtors' operations and businesses at the outset thereof depend on the Debtors' ability to continue to fund their operations, meet payroll and other operating expenses, as well as preserve the going concern value of their various Apartment Complexes.  In the absence of the ability to use cash collateral or obtain post-petition financing, the Debtors will not be able to fund operations, meet payroll and other operating expenses or preserve the going concern value of their assets which will result in serious and irreparable harm to the Debtors and their estates.

107.      The Debtors submit that the terms and conditions set forth in the DIP Loan Documents, taken as a whole, are fair and reasonable under the circumstances; reflect the Debtors' and their respective members and partners' exercise of prudent business judgment consistent with their fiduciary duties; and are supported by reasonably equivalent value and fair consideration.

51

2547428-4

108.    I understand that the DIP Lender, Mr. Miles, is willing to provide the Post-Petition Advances under the DIP Credit Agreements and that the DIP Loan will be secured by a junior lien on the Debtors' property subject of pre-existing liens, a super-priority administrative expense claim pursuant to Section 364(c)(1) and (3) of the Bankruptcy Code, and a) Second-priority Liens and security interests and assignment of leases, rents and profits in and to all of the real property, leases and personal property owned by any of the Debtors from time to time (subject to the Pre-Petition Permitted Liens, liens for real property taxes and existing mechanics liens and materialmen liens affecting such real property), including, without limitation, the real and personal property described on **Schedule 3.1(a)** to the DIP Loan Credit Agreement; b) First priority Liens and security interests in and to all (i) of Lender's ownership interests in and to any of the Debtors, as such ownership interests are set forth on **Schedule 3.1(b)** to the DIP Loan Credit Agreement and (ii) of any Debtor's ownership interest in and to any of the Debtors, as such ownership interests are set forth on **Schedule 3.1(b); c)** First-priority Liens and security interests in and to all other real property, leases, personal property, other properties, assets and proceeds which are owned by or due to the Debtors, and which are not the subject if any Pre-Petition Permitted Liens, as is set forth on **Schedule 3.1(c)** to the DIP Loan Credit Agreement; and d) All books, records, writings, data bases, information and other property relating to, used or useful in connection with, or evidencing, embodying, incorporating or referring to, any of the foregoing, provided that Lender's rights therein shall be limited to access thereto, upon reasonable notice and during business hours.

52

2547428-4

109.    . To the extent there is property not subject to existing liens, that property (real or personal) will secure the proposed financing. The DIP Lender is *not* seeking to prime existing liens.

110.    I understand that the Debtors may make voluntary prepayments in respect of the Loan at any time upon notice to the Lender, with the prepayments to be applied as set forth in the DIP Credit Agreement and that the entire outstanding principal amount of the DIP Loan, together with all accrued interest and other monetary Post-Petition Liabilities, will be due and payable in full by not later than the first to occur of:  (i) the appointment of a Chapter 11 Trustee in any of the Debtors' Chapter 11 cases pursuant to § 1104 of the Bankruptcy Code, (ii) the appointment of a Chapter 11 Trustee in the Daniel Miles Bankruptcy Proceeding pursuant to § 1104 of the Bankruptcy Code, (iii) conversion or dismissal of the Daniel Miles Bankruptcy Proceeding pursuant to § 1112 of the Bankruptcy Code, or (iv) the conversion or dismissal of any of the Debtors' Chapter 11 cases pursuant to § 1112 of the Bankruptcy Code.

111.    I understand that the Lender has agreed that 100% of any distributions payable to Daniel  Miles from any Debtor shall be retained by such Debtor for general working capital purposes or may be paid by such Debtor to any other Debtor to assist in the operations of such other Debtor and that any such distributions payable to Daniel  Miles which are retained by, and/or otherwise used by, the Debtors will not decrease the Maximum Loan Amount.

112.    I understand that each of the Debtors will be jointly and severally liable to the DIP Lender for the full amount of the Loan.  In the event any Debtor pays any amount to the DIP Lender under the Loan, each of the Debtors, on a joint and several basis, agree to indemnify and

2547428-4

contribute to such paying Debtor(s) the pro rata portion of the amount paid by the paying Debtor(s) to the DIP Lender under the Loan.

113.    I believe that the DIP Lender has acted in good faith in consenting to and in agreeing to provide the financing under the DIP Credit Agreement. The parties have negotiated the DIP Credit Agreement and the Debtors' use of cash collateral at arms' length and in good faith. The DIP Lender would not agree to provide the DIP Credit Agreement, absent the approval of the terms and conditions set forth in the DIP Loan Documents and the Interim Order.

114.    For the reasons stated above, I believe it is essential that the relief sought be granted immediately and that granting the relief sought is in the best interests of the Debtors and their estates.

115.    This concludes my declaration.

I DECLARE UNDER PENALTY OF PERJURY THAT FOREGOING IS TRUE AND CORRECT.

Executed on January 12, 2010.

Ronald L. Glass
Debtors' Chief Restructuring Officer

54

2547428-4

# COMPOSITE EXHIBIT "A"

Organizational Charts

2547428-4



**Organizational Structure of Miles-April Ridge, LLC**



**Organizational Structure of MPI Chaucer, LLC**



**ORGANIZATIONAL STRUCTURE– MPI Portfolio I, LLC and Related Entities**

MPI Entity Managers, Inc.,
a Georgia Corp.
(Sole Member)

MPI Portfolio Holdings Manager, LLC,
a Georgia LLC
(Non-Member, Sole Manager)

MPI Portfolio Holdings, LLC,
a Georgia LLC
(Sole Member)

Members

MPI Portfolio I, LLC,
a Georgia LLC
(SPE)
(Sole Member)

MPI British Woods, LLC; MPI Azalea, LLC; Miles-Fox Hollow, LLC;
Miles-Oak Park, LLC; Miles-Cherry Hill, LLC; MPI Sunset Place, LLC;
MPI Palms West, LLC; MPI Cimarron, LLC

MPI Portfolio I Manager, LLC,
a Georgia LLC
(Non-Member, Sole Manager)
(SPE)

MPI Entity Managers, Inc.,
and Daniel J. Miles
a Georgia Corp.
(Sole Member)

Daniel J. Miles
(Sole Shareholder
and Director)

2 Independent Managers
and Daniel J. Miles
(Non-Member, Managers)

**EXHIBIT "B"**

**(Multifamily Properties Under MPI Management)**

1. Hampton Oaks (MPI Meridian Property, LLC)
2. Highland Brooke (MPI Azalea, LLC)
3. Highland Gardens (Miles-April Ridge, LLC)
4. Highland North (Miles-Cherry Hill, LLC)
5. Regal Oaks (MPI Woodland View, LLC)
6. Regency Lane (MPI Foxglenn, LLC)
7. Regency Square (MPI Berkley, LLC)
8. Woodland View (MPI Woodland View, LLC)
9. Ansley Oaks (Miles-Ansley Oaks, LLC)
10. Hampton Commons (MPI Brittany, LLC)
11. Highland Enclave (Miles-Fox Hollow, LLC)
12. Highland Greens (Miles-Meadowood, LLC)
13. Highland Village (Hidden Village Associates)
14. Regency Lake (MPI Lakewood, LLC)
15. Hampton Crossing (MPI Ivy Commons, LLC)
16. Hampton Forest (MPI British Woods, LLC)
17. Highland Estates (Miles-Oak Park, LLC)
18. Highland Legends (MPI Eagle Cliff, LLC)
19. Highland Square (Miles-Kings Gate, LLC)
20. Highland Trail (MPI Covington Walk, LLC)
21. Highland Way (MPI Northbrook, LLC)
22. Highland Willows (MPI Willowick, LLC)
23. Highland Woods (Miles-Huntington Woods, LLC)
24. Noble Oaks (Miles-Noble Oaks, LLC)
25. Highland Chateau (MPI English Village, LLC)
26. Highland Creek (MPI Coventry Village, LLC)
27. Highland Hills (MPI Hickory Hills, LLC)
28. Highland Meadows (MPI Carrington, LLC)
29. Highland Pines (MPI Carrington, LLC)
30. Regal Canyon (MPI Cedar Pointe, LLC)
31. Regal Commons (MPI Oakwood, LLC)
32. Regal Crossing (MPI Chaucer, LLC)
33. Royal Estates (MPI Wynter Green, LLC)
34. Royal Isles (MPI Jackson Orlando, LLC)
35. Royal Oaks (MPI Cimarron, LLC)
36. Royal Ridge (MPI Sunset Place, LLC)
37. Royal Springs (MPI Palms West, LLC)
38. 18th Street Warehouse (MPI 18th Street South, LLC)
39. 1010 Central Condominiums (MPI 1010 Central, LLC)